# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**MICHAEL J. MARKS,**

      **Plaintiff,**

  v.                                 Civil Action 2:20-cv-3923
                                     Judge Algenon Marbley
                                     Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Michael J. Marks, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff protectively filed his application for DIB on October 25, 2016, alleging that he was disabled beginning September 20, 2016. (Tr. 189–96). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on April 18, 2019. (Tr. 45–76). On July 3, 2019, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 8–29). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–7).

Plaintiff filed the instant case seeking review of the Commissioner's decision on August 3, 2020 (Doc. 1), and the Commissioner filed the administrative record on December 23, 2020 (Doc. 12). Plaintiff filed his Statement of Errors on March 10, 2021 (Doc. 15). Defendant filed an

Opposition on April 26, 2021. (Doc. 16). Plaintiff did not file a reply. Thus, the matter is ripe for consideration.

### A. Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's hearing:

> The [Plaintiff] testified, or elsewhere alleged, that he cannot work due to a number of impairments and related symptoms (see also Exhibit 3E). He indicated that at the time of his alleged onset date he suffered a work injury requiring a cervical fusion surgery. Though this resolved his numbness, he indicated that he still has pain. He further noted that he has lower back pain with pain going down his legs, reporting that he has trouble walking and gripping with his hands and his legs sometimes "go out" when he sits too long and then stands, resulting in several falls. For treatment, the [Plaintiff] testified that he uses ice packs, has had injections, does stretches, and goes to therapy. At hearing he reported only 20 percent relief from the injections. He admitted, however, that he told his doctors the injections were more effective than they actually were because he does not like injections. As for his daily activities, the [Plaintiff] reported that he is the primary caregiver of his children in the summer months, but he does not do a lot and he spends three hours in the recliner each day. Still, he indicated he is able to perform self-care, such as dressing himself, he does chores around the house, he drives, he is able to watch his kids' basketball games, he gets along well with his wife and he visits a few friends.

(Tr. 17–18).

> The [Plaintiff] testified that he minimized his symptoms when he met with treating providers because he liked to "play the tough guy" and because he wanted to avoid surgery or additional injections. However, he also testified that one of his providers told him that he was too young for surgery, which negates this explanation.

(Tr. 20–21).

### B. Relevant Medical Evidence

Because Plaintiff attacks only the ALJ's treatment of his physical impairments, the Court focuses on the same. The ALJ summarized Plaintiff's medical records and symptoms related to his impairments:

> [T]he [Plaintiff] presented to the emergency department with reports of a pulled muscle due to a workplace injury (Exhibit 1F). He reported numbness in his chest and torso, in his bilateral fourth and fifth digits, and in the outer aspect of his upper and lower extremities. He indicated that his legs were weak when he stood (Exhibits

2

1F, 3F). Upon examination, the [Plaintiff] exhibited a positive right straight leg raise and paraspinal tenderness over the right trapezius, but he retained a normal gait and station and normal sensation. Imaging performed at that time showed an unremarkable cervical spine and mild degenerative joint disease of the thoracic spine (Exhibits 1F, 2F/31). The [Plaintiff] began therapy and was prescribed medications, but reported that his legs continued to feel weak, exhibiting decreased sensation, but normal strength and tone of the upper extremities, with decreased upper extremity strength, including decreased grip strength, noted (Exhibit 1F).

Further imaging was performed as a result of progressive bilateral arm and leg weakness and numbness, and the [Plaintiff] was found to have a herniated intervertebral disc in the cervical spine resulting in severe central canal stenosis with spinal cord compression and intrinsic cord signal change (Exhibits 2F, 6F/8, 11F). Subsequently, in November 2016, the [Plaintiff] underwent a cervical spinal fusion, which reportedly resolved the numbness in his chest and torso, but did not immediately improve the symptoms of radiculopathy in his upper extremities (Exhibits 2F, 3F). When seen in post-surgical follow-up, the [Plaintiff] reported that he was doing well, complaining only of numbness in the fourth and fifth digits (Exhibit 11F). On exam, he exhibited intact sensation and 5/5 strength in the upper and lower extremities bilaterally. In February 2017, only a couple of months after his cervical fusion surgery, the [Plaintiff] underwent a physical consultative examination, complaining of constant burning and electrical -type pain in his neck which was reportedly made better by stretching and a transcutaneous electronic nerve stimulation (TENS) unit (Exhibit 3F). Upon examination, the [Plaintiff] was unable to walk on his heels and he exhibited slight tenderness to palpation over the cervical spine, but he was well groomed, able to get on and off the examination table unassisted without difficulty, able to walk with a normal gait without the use of an assistive device, and able to walk heel-to-toe, walk on his toes, hop, and squat. He exhibited 4/5 strength in regard to bilateral finger abduction and adduction, but all other joints and muscles appeared to have 5/5 strength bilaterally. Decreased sensation was also demonstrated in the bilateral fourth and fifth digits as well as in the lateral aspect of the upper and lower arms bilaterally. As for range of motion, the [Plaintiff] demonstrated decreased range of motion in the cervical spine, but fine fingering was normal bilaterally and grip strength was 5/5 bilaterally.

In March 2017, a physical examination showed normal gait and normal sensory examination of the lower extremities (Exhibit 13F). Normal sensation was found in the proximal arms, but diminished from the distal upper extremities below the elbows. While motor strength was largely 5/5, there was some reduction to 4/5 regarding intrinsics and triceps. The [Plaintiff] underwent a nerve conduction study in April 2017 showing normal results in the neck and both upper extremities (Exhibit 5F/29-30). Treatment notes from April 2017 also indicate that the [Plaintiff] underwent a myelogram of the cervical and thoracic spines, with the results showing mild discogenic and uncovertebral joint disease of the cervical spine without significant central canal or neural foraminal stenosis at C3-C4 and C4-C5, and a small osteophyte at C5-C6 resulting in mild to moderate central canal

stenosis (Exhibits 4F, 5F). As for the thoracic spine, results showed mild multilevel osteophyte formation without significant central canal stenosis. Imaging of the lumbar spine performed the following month showed a mild degree of overall congenital spinal stenosis of the lumbar spine with some scattered degenerative change along the lumbar spine most pronounced at L5-S1, with no critical compressive radiculopathy (Exhibits 5F, 6F). As a result of continued lower back pain, the [Plaintiff] was referred for injection therapy (Exhibit 6F). Treatment notes from around this time indicate that the [Plaintiff] reported that his symptomology of numbness and tingling down the arms into the fourth and fifth digits bilaterally had slowly improved and that physical therapy improved his strength on a gradual basis (Exhibit 6F/6). He also denied difficulty with his balance.

Physical examinations from mid-2017 show the [Plaintiff] presented with normal gait and normal upper extremity muscle tone (Exhibit 13F). Beginning in August 2017, through April 2019, the [Plaintiff] underwent chiropractic therapy due to a sharp discomfort in the lumbar spine (Exhibit 16F). Generally, the [Plaintiff] was noted to tolerate treatment well and show improvement in his condition. Pain management notes indicated that the [Plaintiff] continued to report chronic back pain in late-2017 and early 2018, exhibiting 4/5 strength, limited range of motion, and a positive straight leg raise along with some tenderness to palpation (Exhibits 8F, 13F). However, these findings do not appear chronic as later visits show full strength. Pain management notes also show significant benefit from injection therapy, which the [Plaintiff] began in November 2017. Treatment notes from March 2018 and April 2018 indicate that the [Plaintiff] had some decreased range of motion, but his strength was intact at 5/5 bilaterally and he exhibited normal gait and station (Exhibits 7F, 14F). Pain management notes from May 2018 show that while the [Plaintiff] exhibited paraspinal tenderness, he also had normal ambulation, normal and equal strength and sensation of both lower extremities, and a negative straight leg raise (Exhibits 8F/6-7, 13F). He also reported 60 percent relief of symptoms from his prior injections (Exhibits 8F, 9F/7, 13F).

Tenderness and reduced range of motion, but a negative straight leg raise, were exhibited in July 2018 (Exhibits 9F, 13F). The [Plaintiff] underwent nerve branch blocks in September 2018 and, in November 2018, he reported 80 percent or greater relief of pain from the September treatment, which was still effective in November. Though tenderness was exhibited upon examination, the [Plaintiff] had negative straight leg raises bilaterally.

Treatment notes from January 2019 indicate that the [Plaintiff] had been doing physical therapy once a week (Exhibit 13F/69). Upon examination he exhibited tenderness, reduced range of motion, and a positive Patrick's test, but negative straight leg raises bilaterally. Other treatment notes from early 2019 show that his gait and station were normal, he had 5/5 strength bilaterally, normal sensation, and no focal deficits (Exhibit 14F). Though some neck pain and tightness were noted for a period of approximately two to three weeks, no physical examinations support

4

the same nor are there any diagnostic findings from that time to further explain such reports (Exhibit 17F).

The records also document that the [Plaintiff] has a history of morbid obesity with a body mass index (BMI) of, at times, greater than 50 (see e.g. Exhibits 1F, 6F, 7F, 14F).

(Tr. 18–20).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through December 31, 2021, and had not engaged in substantial gainful employment since his alleged onset date of September 20, 2016. (Tr. 13). The ALJ determined that Plaintiff has the following severe impairments: degenerative disc disease of the cervical, thoracic, and lumbar spine; status post cervical fusion; and obesity. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 16).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

After careful consideration of the entire record, [the ALJ] find[s] that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the [Plaintiff] can frequently finger with the bilateral upper extremities and climb ramps and stairs, and he can occasionally push and pull with the bilateral upper extremities, reach overhead, stoop, kneel, crouch, and crawl. The [Plaintiff] cannot climb ladders, ropes, or scaffolds, and he must avoid hazards, such as unprotected heights or work in proximity to exposed moving mechanical parts.

(Tr. 17).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence and other evidence in the record for the reasons explained in this decision." (Tr. 18). The ALJ then turned to the opinion evidence.

As for the opinion evidence, I have read and considered the opinions of the State Agency consultants and assign partial weight (Exhibits 1A, 3A). I have adopted the

5

same exertional limit to light work and most of the postural limitations. However, I have reduced the stooping, kneeling, and crouching limitations to occasional given the [Plaintiff]'s subjective lumbar pain and consistent record of treatment for the lumbar area (see e.g. Exhibits 8F, 9F, 13F). I have also changed frequent handling to frequent fingering as, after the immediate post-operative period for the [Plaintiff]'s cervical fusion, his bilateral upper extremity strength appears to be normal and his only lingering issue is some numbness in his fourth and fifth digits, which would be expected to impact fingering rather than handling (though I note the consultative examiner found normal manipulation abilities and grip). Finally, I have expanded hazard limitations beyond unprotected heights, given the [Plaintiff]'s pain complaints.

The records show that the [Plaintiff] asked for a handicap placard and was provided one by his primary care provider (Exhibits 7F/4-8, 14F/11-12). Such placard indicated that the [Plaintiff] could not walk over 50 feet and was intended to last for a two-year duration; however, on the date the placard was prescribed, the [Plaintiff]'s examination was totally within normal limits, other than his noted obesity. Specifically, he had normal gait, station, sensation, strength, and deep tendon reflexes, and no focal deficits. The overall evidence also does not support the opinion that the [Plaintiff] could not walk for more than 50 feet or that he needed a handicap placard (see e.g. Exhibits 8F, 9F, 13F). Further, the standards for these placards do not mirror those of the Social Security program. Though not an opinion per se, I do not find that such a placard is persuasive or indicative of disability in any way.

Finally, I note that, following the [Plaintiff]'s bicep repair, temporary activity restrictions were given, indicating that the [Plaintiff] may advance activities without restriction after the three[-]month mark, with a recommendation for a slow resumption of heavier activities, expected to take at least six weeks (Exhibit 15F). Little weight is given as the restrictions themselves indicate that they are to be temporary, and the evidence shows that following a short recovery period from surgery the [Plaintiff] had no further complaints or treatment for his bicep, as discussed above under nonsevere impairments.

(Tr. 21–22).

Relying on the VE's testimony, the ALJ concluded that Plaintiff was unable to perform his past relevant work as a diesel mechanic, but could perform jobs that exist in significant numbers in the national economy, such as a cleaner housekeeper, office worker, and a cashier. (Tr. 23–24). The ALJ therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from September 20, 2016, through the date of this decision (20 CFR 404.1520(g))."

6

(Tr. 24).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

In his sole assignment of error, Plaintiff alleges that the ALJ's evaluation of consultative examiner Dr. Zachary Gatton's opinion is not supported by substantial evidence and is inconsistent with the evidence of record. (Doc. 15 at 8). Specifically, Plaintiff argues that the ALJ erred in crafting his RFC because she failed to identify evidence showing that his condition improved and by mischaracterizing the evidence. (*Id.* at 8–12). Defendant, conversely, argues that "'[t]he ALJ performed [her] duty, which is to weigh the evidence, resolve material conflicts, make independent

findings of fact, and determine the case accordingly.'" (Doc. 16 at 6 (quoting *Heskett v. Comm'r of Soc. Sec.*, No. 2:20-cv-3171, 2021 WL 1169113, *7 (S.D. Ohio Mar. 29, 2021)). Upon review, the Undersigned finds Plaintiff's arguments without merit.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ will give each opinion the weight deemed appropriate based on factors such as whether the physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the entire record. 20 C.F.R. § 416.927(c). The ALJ may reject an opinion that is inconsistent with the record. 20 C.F.R. § 416.927(c)(4); *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

Dr. Gatton examined Plaintiff on February 3, 2017. (Tr. 541). Notably, this examination was conducted only two and half months after Plaintiff had a cervical fusion. (Tr. 22). As will be discussed, the ALJ found that the record shows Plaintiff experienced "significant improvement" following this procedure. (*Id*. (citing Tr. 383–86, 541–47)). During his examination, Dr. Gatton performed a clinical interview, a physical examination, a neurological examination, and had access

to some of Plaintiff's medical records. (Tr. 541–43). Dr. Gatton opined that:

> The claimant is a 33-year-old male with a past medical history of ruptured cervical disc status post anterior cervical fusion with residual cervical radiculopathy. The claimant does demonstrate decreased grip strength bilaterally as well as decreased sensation to light touch bilaterally in the upper extremities. This claimant should be able to walk for two hours of eight hours in a day. He could probably be on his feet for a combined total of five to six out of eight hours in a day. He probably could not carry less than 10 pounds frequently nor could he carry more than 10 pounds on occasion based on his cervical radiculopathy symptoms. This claimant has no limitations in regard to vision, hearing or speech.

(Tr. 543). Upon review of this opinion, the ALJ afforded it "little weight," finding it was both inconsistent with the evidence showing significant improvement as well as being internally inconsistent. (Tr. 22). Specifically, the ALJ opined:

> Little weight is given to the opinions of the physical consultative examiner, Zachary Gatton, M.D. (Exhibit 3F). This examination was performed only a couple of months after the claimant's cervical fusion surgery; however, treatment records indicate significant improvement over time to the point where the claimant does not appear to have sought any specific treatment for the upper extremities or the cervical spine after May 2017, with later treatment focused on lumbar pain instead (*see e.g.* Exhibits 8F, 9F, 11F, 13F). Therefore, while Dr. Gatton found weakness in the fingers and abnormal grasp, but a normal grip strength, later evidence indicates improvement. Additionally, Dr. Gatton appears to make findings that are abnormal only in the upper extremities, and he noted that the claimant could get on and off the table without difficulty, walked with a normal gait, could heel-to-toe walk, toe walk, hop, and squat, but could not heel walk. However, he opined that the claimant should be limited to walking two hours, being on his feet five to six hours, and carrying at the sedentary level. Not only is this internally consistent, but Dr. Gatton failed to establish the relationship between the limits he provided and the claimant's impairments as the claimant's cervical and upper extremity findings do not explain any standing and walking limitations. [T]he evidence does not support such limitations after his pre-operative and immediate post-operative period (*see e.g.* Exhibits 8F, 9F, 13F).

(*Id.*).

The Court finds that each of the ALJ's determinations here is supported by substantial evidence. Specifically, the ALJ built a "logical bridge" between this opinion evidence and Plaintiff's RFC, sufficiently identified evidence showing that Plaintiff's condition did improve

since Dr. Gatton's examination and did not mischaracterize the evidence. First, the ALJ's conclusion that Dr. Gatton's opinion is not consistent with the medical evidence of record is supported by substantial evidence. Specifically, the ALJ found that "treatment records indicate[d] significant improvement over time to the point where the claimant does not appear to have sought any specific treatment for the upper extremities or the cervical spine after May 2017 . . . " (Tr. 22). The record supports this conclusion. (*See* Tr. 587, 650, 664, 668, 685–686 (showing that after Dr. Gatton's examination, Plaintiff saw improvement in his condition with treatment and therapy); *see also* Tr. 614, 663–64, 668, 725, 727, 729, 732 (showing Plaintiff saw significant relief from injection therapy and was generally able to ambulate independently with a normal gait, station, and tone)).

Given this analysis, Plaintiff's assertion that "the ALJ did not correctly characterize the record" in determining that he had seen "significant improvement" in his upper extremities and cervical spine, is meritless. (*See* Doc. 15 at 9). Plaintiff has offered no examples of opinion evidence that would undermine the ALJ's contention that, after 2017, his treatment was "nearly entirely focused on the low back, rather than the neck, with pain management examination largely limited to lumbar and lower extremity findings." (Doc. 16 at 10 (citing Tr. 16)). In fact, "every treatment record after May 2017 that Plaintiff cites to concerns his lumbar spine or lower extremities, except for one record that pertains to his hands and arms." (*Id*. at 11 (citing Tr. 17)). So, while Plaintiff may not have seen improvement in all his conditions, he saw specific improvement in the areas where Dr. Gatton recommended functional limitations. Accordingly, the ALJ did not mischaracterize evidence and, as her ultimate conclusion has support, the Undersigned cannot conclude that the she improperly assigned Dr. Gatton's opinion "little weight."

10

Similarly, the ALJ also did not err in finding that Dr. Batton's opinion was internally inconsistent. Here, the ALJ found that "Dr. Gatton appears to make findings that are abnormal only in the upper extremities . . . [h]owever, he opined that the claimant should be limited to walking two hours, being on his feet five to six hours, and carrying at the sedentary level." (Tr. 22). Dr. Gatton opined that "[t]he claimant walks with a normal gait without the use of an assistive device[;] is able to walk heel-to-toe on his toes[;] hop and squat . . . All major joints appear anatomically normal without evidence of inflammation, swelling or effusion." (Tr. 542). Despite these conclusions, Dr. Gatton opined that Plaintiff "should be able to walk for two hours of eight hours in a day . . . [and] could probably be on his feet for a combined total of five to six out of eight hours in a day." (Tr. 543). These contentions are incompatible and illustrate, as the ALJ opined, that Dr. Gatton's opinion is internally inconsistent.

In fact, the state agency physicians that reviewed Dr. Gatton's opinion, also highlighted this internal inconsistency. (*See* Tr. 95 (assessment report from state agency physician Mehr Siddiqui, M.D. finding that Dr. Gatton's opinion was not consistent with the overall record); Tr. 109 (assessment report from state agency physician William Bolz M.D. finding the same)). Because such internal inconsistency is an acceptable ground for discounting a medical opinion, the Undersigned further finds the ALJ did not err here. *See Hanna v. Colvin*, No. 5:13CV1360, 2014 WL 3749420, at *15 (N.D. Ohio July 30, 2014) (upholding an ALJ's decision to reject a medical opinion on the grounds that it was incomplete and internally inconsistent, and noting that "courts have upheld an ALJ's rejection of a physician opinion on the grounds that it is inconsistent, unclear, or vague").

Ultimately, Plaintiff asks this Court to re-weigh the evidence relating to his impairments and decide the outcome of this case differently. This request is impermissible under the substantial

evidence standard of review. The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Bradley v. Sec'y of Health and Human Serv.*, 862 F.2d 1224, 1228 (6th Cir. 1988); *Young v. Sec'y of Health and Human Servs.*, 787 F. 2d 1064, 1066 (6th Cir. 1986); *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996). Even if this Court would have decided the case differently, it must give deference to the ALJ and affirm her findings if substantial evidence supports them. *Id*. Because substantial evidence supports the ALJ's analysis and conclusion, the Undersigned recommends affirming.

Finally, and briefly, the Court addresses one final argument Plaintiff makes in his statement of errors. Plaintiff argues that he may have been entitled to "a closed period of disability" because the ALJ "never indicated when the record demonstrated improvement to the point where Dr. Gatton's opinions were no longer credible." (Doc. 15 at 12). Defendant contends that this argument is "unavailing." (Doc. 16 at 15). The Court agrees.

Plaintiff "appears to be asserting that the ALJ was required to use 'magic words' and specifically indicate that a closed period of disability had been considered and rejected[,]" but "[n]o law exists to support this assertion." *Sielaff v. Comm'r of Soc. Sec.*, Case No. 1:10-CV-1571, 2012 WL 567614, at *1 (N.D. Ohio, Feb. 21, 2012). In fact, the ALJ found that Plaintiff has not been under a disability from September 20, 2016, his alleged onset date, through the date of the decision. (Tr. 11–24). And, as Defendant points out, "[t]his necessarily includes any and all 12-month consecutive blocks of time." (Doc. 16 at 15). "[A]s it is clear that the ALJ considered all of the medical evidence introduced that related to the closed period, [her] conclusion that [Plaintiff] was not disabled clearly includes a finding that [he] was not entitled to a closed period of disability." *Sielaff*, 2012 WL 567614, at *1.

## IV. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### **Procedure on Objections**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: June 2, 2021

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE